768 F.2d 1480
 248 U.S.App.D.C. 47, 15 Envtl. L. Rep. 20,894,
1984-1985 O.S.H.D. ( 27,346
 OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION and
Public Citizen Health Research Group, Petitioners,
v.
David ZEGEER, Assistant Secretary of Labor, Federal Mine
Safety & Health Administration, et al., Respondents,
American Mining Congress, Intervenor.
 No. 84-1635.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 24, 1985.
Decided Aug. 2, 1985.
 
 Petition for Review of an Order of the Federal Mine Safety & Health Review Administration.
 David C. Vladeck, Washington, D.C., with whom Alan B. Morrison and Eric R. Glitzenstein, Washington, D.C., were on brief, for petitioners.
 Linda L. Leasure, Atty., Dept. of Labor, Arlington, Va., with whom Cynthia L. Attwood, Associate Sol., Arlington, Va., and Michael A. McCord, counsel for the Office of the Sol., Dept. of Labor, Washington, D.C., were on brief, for respondents.
 Robert C. Seldon, Asst. U.S. Atty., Washington, D.C., entered an appearance for respondents.
 Anthony J. Thompson, Washington, D.C., with whom Charles E. Sliter, Larry A. Boggs and Henry Chajet, Washington, D.C., were on brief, for intervenor American Min. Congress.
 Before GINSBURG and BORK, Circuit Judges, and McGOWAN, Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 This case concerns the exposure of underground miners, particularly in uranium mines, to radon daughters, the radioactive decay products of radon gas. Radon daughters, free-floating or attached to dust, smoke, or fine moisture droplets, can be inhaled by miners and become lodged in nose, pharynx, or lungs; the deposited products may eventually induce respiratory cancer. Since the spring of 1980, petitioners Oil, Chemical and Atomic Workers International Union (OCAW) and Public Citizen Health Research Group (PCHRG) have pressed respondent Mine Safety and Health Administration (MSHA) to reduce the permissible levels of radon daughters to which miners may be exposed.[1] In this proceeding, OCAW and PCHRG ask us to determine whether MSHA has "improperly withheld" or "unreasonably delayed" regulatory action regarding radon daughter exposure. See 5 U.S.C. Sec. 555(b) (1982) (general requirement that agencies conclude matters before them "within a reasonable time"); id. Sec. 706(1) (authority of reviewing court to compel agency action "unreasonably delayed"). MSHA,[2] supported by intervenor American Mining Congress (AMC),[3] maintains, initially, that the standard-setting matter at issue lies entirely within the administrator's discretion and outside the province of any court to review.
 
 
 2
 We hold that MSHA's rulemaking endeavor responsive to the OCAW-PCHRG petition is subject to court review to determine whether the agency is engaged in unjustifiable delay. We find, however, that MSHA is now proceeding on a reasonable schedule in reconsidering radon daughter standards. Under the circumstances as they currently appear to us, if the agency adheres to the schedule it submitted to the court, there will be no occasion for an order requiring further expedition. Should MSHA veer from the timetable it has undertaken to follow, petitioners may renew their application for a court order requiring agency action that is not unreasonably delayed.
 
 I. BACKGROUND
 
 3
 The ore in uranium and certain other mines contains radium in considerably higher than average concentrations. Radium gives off radon gas as it disintegrates. Radon, in turn, decays through a series of four "daughter" products. Radon daughters are heavy metal particulates that disintegrate at a rapid rate. Two of the four daughters release alpha radiation; this radiation, if the daughters are inhaled and deposited in the respiratory system, is capable of eventually inducing cancer. See Federal Defendants' Statement of Material Facts as to Which There Is No Genuine Dispute, Oil, Chemical & Atomic Workers International Union v. Zegeer, Civ. No. 84-0760 (D.D.C.), reprinted in Joint Appendix (J.A.) at 382-83.
 
 
 4
 Exposure to radon daughters is measured in working levels (WL) and working level months (WLM). A WL is a standard measurement of radon daughter concentration in the air; a WLM is equal to 173 hours' cumulative exposure at 1 WL. WL thus represents the exposure rate while WLM represents the cumulative exposure, "i.e., 1 WLM means the inhalation of air containing a radon daughter concentration of 1 WL for 173 hours." Id. at 383. Current MSHA standards set the maximum permissible single exposure to radon daughters at 1 WL and the maximum calendar year exposure at 4 WLM. See 30 C.F.R. Sec. 57.5-38 to -39 (1984).
 
 
 5
 MSHA's limit of 4 WLM in any calendar year originated fourteen years ago, in 1971, when the Environmental Protection Agency (EPA) published federal radiation protection guidance regarding radon daughters. See 36 Fed.Reg. 9480 (1971). EPA's recommendations were incorporated, automatically, into regulations governing underground mines. See 30 C.F.R. Sec. 57.5-42 (1984). Thereafter, in 1976, MSHA's predecessor agency explicitly adopted the 4 WLM/year standard. 41 Fed.Reg. 23,611, 23,616-17 (1976).
 
 
 6
 MSHA became the responsible agency the next year, upon the enactment of the Federal Mine Safety and Health Amendments Act of 1977 (Mine Act), Pub.L. No. 95-164, 91 Stat. 1290 (codified as amended in scattered sections of 30 U.S.C.). This legislation placed regulation of the entire mining industry under a single statute. The Mine Act transferred from the Interior Department to the Department of Labor, acting through MSHA, the task of inspecting mines and enforcing mine health and safety standards. See 30 U.S.C. Secs. 813-820 (1982) (provisions on mine inspections, citations and penalties for noncompliance with mandatory health or safety standards and other requirements of the Act). In addition to enforcement (inspection and prosecution) functions, MSHA carries out the provisions of the Mine Act that direct the Secretary of Labor to develop, promulgate, and revise mandatory safety and health standards. See id. Sec. 811.
 
 
 7
 Charging that the current standards for radon daughter exposure afford miners inadequate protection, OCAW and PCHRG petitioned MSHA, on April 21, 1980, for immediate promulgation of an emergency temporary mandatory standard (ETMS). See id. Sec. 811(b).[4] On April 30, 1980, the Assistant Secretary for Mine Safety and Health wrote to the petitioners noting steps taken over the preceding two years to improve the protection afforded miners exposed to radiation hazards, expressing "aware[ness] that further improvements ... may be warranted," and reporting that "[w]ith respect to the central issue of a reduction in the permissible exposure limit, MSHA will be relying heavily on input from NIOSH [the National Institute for Occupational Safety and Health],[5] which is presently engaged in an assessment of data related to the exposure of miners to radon daughters." Letter from Robert B. Lagather to Sidney M. Wolfe, M.D., Director, PCHRG, reprinted in J.A. 5-6.
 
 
 8
 Months of information gathering became years. MSHA found the problem exceedingly complex and the NIOSH reports wanting.[6] There were letter exchanges between the petitioners and Department of Labor officials in 1982 and 1983, see J.A. 13-19, but the petition seeking more protective standards received no formal response. On March 13, 1984, OCAW and PCHRG sought relief from the district court; they filed a complaint, J.A. 20, alleging that MSHA had engaged in unreasonable delay and requesting a decree ordering MSHA to "significantly reduc[e] the permissible level of exposure to radon daughters by underground miners." Id. at 25. AMC intervened in the action as a party defendant in June 1984. Hefty cross motions followed: OCAW and PCHRG sought summary judgment directing imposition of an ETMS; MSHA and AMC sought dismissal or, in the alternative, summary judgment.
 
 
 9
 This court's October 24, 1984, decision in Telecommunications Research & Action Center v. FCC, 750 F.2d 70 (D.C.Cir.1984) (TRAC ), intercepted the district court's consideration of the cross motions. TRAC settled a matter on which circuit precedent had been untidy; the TRAC panel held:
 
 
 10
 [W]here a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals.
 
 
 11
 Id. at 78-79. The district court in the instant case observed that the Mine Act provides for review of a mandatory health or safety standard, once promulgated, exclusively in the court of appeals. See 30 U.S.C. Sec. 811(d) (1982). OCAW and PCHRG sought to compel promulgation of such a standard. TRAC instructed that a complaint of that genre, charging unreasonably delayed agency action, can be aired only in a court of appeals competent to review the action once it has been taken. Following TRAC 's direction, see 750 F.2d at 79 n. 37, the district court transferred the case here, pursuant to 28 U.S.C. Sec. 1631 (1982). See Oil, Chemical & Atomic Workers International Union v. Zegeer, Civ. No. 84-0760 (D.D.C. Dec. 7, 1984) (transfer order).
 
 
 12
 Soon thereafter, MSHA announced two measures that fixed the dimensions of this case. On January 18, 1985, MSHA embarked on rulemaking. The agency issued an Advance Notice of Proposed Rulemaking (ANPR) requesting comment on a host of issues relating to the adequacy of the current standards to protect miners, in both surface and underground mines, from radiation hazards. See 50 Fed.Reg. 4144 (1985). That same day, MSHA notified OCAW and PCHRG that their April 21, 1980, request for an ETMS had been denied because the evidence fell short of establishing the "grave danger" on which emergency action turns. Letter from David A. Zegeer, Assistant Secretary for Mine Safety and Health, to Sidney M. Wolfe, M.D., Director, PCHRG, reprinted in J.A. 504-06; see supra note 4. A motions panel of this court then dismissed as moot the OCAW-PCHRG plea for an order compelling MSHA to rule on the ETMS request. Oil, Chemical & Atomic Workers International Union v. Zegeer, No. 84-1635 (D.C.Cir. Jan. 31, 1985).
 
 
 13
 Not only is the plea for an MSHA response to the ETMS request moot; in addition, OCAW and PCHRG have entirely relinquished their claim that an ETMS should issue on radon daughter exposure. Petitioners' Reply Brief at 2. Petitioners now confine their judicial review application to the question whether the agency is moving at too tardigrade a pace in its rulemaking proceeding. MSHA should move faster, petitioners contend, in considering and deciding through rulemaking whether and how to change the current radiation standards.
 
 
 14
 On May 24, 1985, we heard oral argument addressed to the two issues that remain in this case: 1) whether we have authority to adjudicate the unreasonable delay claim now pressed by petitioners; 2) the merits of the unreasonable delay claim. In the course of the argument, counsel for the federal respondents revealed a further development, one undisclosed until the parties' day in court: MSHA had formulated a timetable for the progress of the rulemaking. Counsel undertook to furnish the timetable to the court, petitioners, and intervenor, and the court specifically ordered a statement "of the dates by which MSHA expects to complete various activities related to the issuance of a rule in this case," including:
 
 
 15
 (a) the date by which MSHA expects to complete its review of comments filed pursuant to the Advance Notice of Proposed Rulemaking;
 
 
 16
 (b) the date by which MSHA expects to issue a Notice of Proposed Rulemaking;
 
 
 17
 (c) the date by which MSHA expects to issue a Rule.
 
 
 18
 Oil, Chemical & Atomic Workers International Union v. Zegeer, No. 84-1635 (D.C.Cir. May 24, 1985). MSHA filed its detailed timetable on June 3, 1985; the table lists June 1987 as the expected time for publication of MSHA's final rule on radiation standards.
 
 II. REVIEWABILITY
 
 19
 We clarify first what the particular claim of agency inaction before us entails. Petitioners do not request review of an exercise of prosecutorial or enforcement discretion. See Heckler v. Chaney, --- U.S. ----, 105 S.Ct. 1649, 1655-56, 84 L.Ed.2d 714 (1985) (agency's refusal to undertake enforcement is presumptively unreviewable). With the original OCAW-PCHRG plea for an ETMS now out of the case, see supra p. 1484, we confront no formal refusal to initiate action. We thus have no occasion to address the matter noted, but left without comment in Heckler v. Chaney: "the question of agency discretion not to invoke rulemaking proceedings." 105 S.Ct. at 1652 n. 2; cf., e.g., Arkansas Power & Light Co. v. ICC, 725 F.2d 716, 723 (D.C.Cir.1984) (holding reviewable agency's rejection of rulemaking request); WWHT, Inc. v. FCC, 656 F.2d 807, 814 (D.C.Cir.1981) (same). Petitioners' claim, in sum, is not that MSHA has wrongfully refused to engage in rulemaking, for the agency here has agreed to pursue a rulemaking course in accordance with a definite schedule. The sole issue petitioners now tender is whether the schedule MSHA has set builds in unreasonable delay. This court has several times reviewed similar claims of undue agency protraction. See, e.g., Public Citizen Health Research Group v. Auchter, 702 F.2d 1150, 1153-54, 1157-59 (D.C.Cir.1983) (per curiam); Potomac Electric Power Co. v. ICC, 702 F.2d 1026, 1034-35 (D.C. Cir.1983); MCI Telecommunications Corp. v. FCC, 627 F.2d 322, 345-46 (D.C.Cir.1980); Nader v. FCC, 520 F.2d 182, 206-07 (D.C.Cir.1975).
 
 
 20
 MSHA and intervenor AMC stress that "[a]lthough MSHA has begun the rulemaking process, it has made no decision whether or to what extent any particular standard will be revised." Post-Argument Statement of the Federal Respondents at 3. But even if an agency, after notice and comment, decides to adhere to current standards and rejects proposed alternative rules, that end result would not be the equivalent of a flat denial of a rulemaking petition. Essentially, in such a case, the agency has 1) granted the petition insofar as it requests reconsideration of the current rules, 2) rejected the petitioner's proposal on the merits, and 3) repromulgated the old rules. See Montana v. Clark, 749 F.2d 740, 744 (D.C.Cir.1984) ("agency decision not to amend longstanding rules after a notice and comment period" effectively repromulgates existing regulation and is therefore "reviewable agency action").
 
 
 21
 MSHA has agreed, at a minimum, to undertake a thorough notice and comment process. Whether the upshot is revision or retention of current standards, we would have authority to review the final agency action. See 30 U.S.C. Sec. 811(d) (1982). We therefore have authority, under the reasoning of our TRAC decision, to consider in aid of our prospective jurisdiction petitioners' interlocutory unreasonable delay claim. We turn now to a brief recapitulation of TRAC, and then to argument by MSHA and AMC (and our reasons for rejecting it) that, however it may be for other agencies, Congress meant to preclude all review of MSHA rulemaking activity at the prepromulgation stage.
 
 
 22
 TRAC involved a petition to compel the Federal Communications Commission (FCC) to decide certain longpending rate controversies. Once the FCC arrived at its decisions, exclusive judicial authority to review the final orders would be in a court of appeals. We observed that the All Writs Act, 28 U.S.C. Sec. 1651(a) (1982),[7] authorized federal courts of appeals to act not only in aid of jurisdiction already acquired by appeal from a final decision, but also to protect their prospective jurisdiction. 750 F.2d at 76. As stated in the TRAC opinion:
 
 
 23
 Because the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes, a Circuit Court may resolve claims of unreasonable delay in order to protect its future jurisdiction.
 
 
 24
 Id.; accord Air Line Pilots Association v. CAB, 750 F.2d 81 (D.C.Cir.1984).
 
 
 25
 TRAC drew additional support from the Administrative Procedure Act (APA), which directs agencies to conclude matters presented to them "within a reasonable time," 5 U.S.C. Sec. 555(b) (1982), and specifies that the "reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed," id. Sec. 706(1). The TRAC panel was well aware that the APA "does not confer an independent grant of jurisdiction." 750 F.2d at 76. That Act, however,
 
 
 26
 does indicate a congressional view that agencies should act within reasonable time frames and that court[s] designated by statute to review agency actions may play an important role in compelling agency action that has been improperly withheld or unreasonably delayed.
 
 
 27
 Id. at 77; see also Garland, Deregulation and Judicial Review, 98 HARV.L.REV. 505, 567-68 (1985).
 
 
 28
 Congress lodged authority to review a Mine Act mandatory health or safety standard, once promulgated, exclusively in courts of appeals. 30 U.S.C. Sec. 811(d) (1982). TRAC, it would appear plain from the decision's terms and logic, requires us to consider the merits of the unreasonable delay claim remaining in this case. But MSHA, supported by AMC, urges that Congress ordered otherwise through two prescriptions. First, the agency and intervenor cite the final sentence of the Mine Act's provision for judicial review of promulgated standards: "The procedures of this subsection shall be the exclusive means of challenging the validity of a mandatory health or safety standard." Id. Second, MSHA and AMC call our attention to 30 U.S.C. Sec. 956, which provides that the APA (5 U.S.C. Secs. 551-559, 701-706) "shall not apply to the making of any order, notice, or decision made pursuant to this [Act], or to any proceeding for the review thereof."
 
 
 29
 We do not believe that either provision, sensibly read, renders MSHA's prepromulgation rulemaking activity untouchable by judicial hands. The last sentence of 30 U.S.C. Sec. 811(d) appears to us designed simply to make the unremarkable point that one who skips over the procedures Congress provided for challenging a rule may not thereafter challenge the rule's validity collaterally in an enforcement proceeding. See S.REP. NO. 181, 95th Cong., 1st Sess. 20-21 (1977).[8]
 
 
 30
 As to the exclusion of the APA's governance specified in 30 U.S.C. Sec. 956, we think it evident that Congress meant to identify, and remove from the APA fold, only the mine legislation's compliance inspection, accident investigation, and sanction adjudication regime--orders, notices, and decisions "in a matter other than rule making." See 5 U.S.C. Sec. 551(6) (1982) (defining the term "order").[9] Congress established detailed prescriptions for MSHA's Mine Act enforcement efforts--inspection of mines and citations against mine operators for violating standards set by and under the Act. See 30 id. Secs. 813-820.[10] While a self-contained Mine Act inspection and compliance adjudication process is altogether comprehensible, we can discern no reason why Congress would choose to insulate MSHA rulemaking[11] from general APA requirements.[12] On the contrary, we find highly implausible the MSHA and AMC suggestion that Congress meant to set MSHA apart from other rulemaking agencies and afford MSHA singular leeway to set standards unconstrained by the APA's instructions.
 
 
 31
 In prior appearances before this court and others, MSHA has indeed recognized that its rulemaking is controlled by the APA. See, e.g., Council of the Southern Mountains, Inc. v. Donovan, 653 F.2d 573 (D.C.Cir.1981) (per curiam). That recognition seems to us difficult to escape. A Congress insistent that "the first priority and concern of all in the ... mining industry must be the health and safety of its most precious resource--the miner," 30 U.S.C. Sec. 801(a) (1982), we believe, could not have intended to give MSHA unbridled discretion to withhold or delay development and promulgation of "improved mandatory health or safety standards." See id. Sec. 801(d).[13]
 
 III. THE AGENCY'S TIMETABLE
 
 32
 Over five years ago, MSHA acknowledged as worthy of "thorough evaluation," on an "expedited basis," the matter set for resolution through the rulemaking launched in January 1985: "whether there exists a significant risk of material impairment of health to justify a reduction of existing [radon daughter] exposure limits." Letters from Robert B. Lagather, Assistant Secretary for Mine Safety and Health, to Sidney M. Wolfe, M.D., Director, PCHRG (Apr. 30 & Sept. 5, 1980), reprinted in J.A. 5-8. After years in which the matter lingered on the agency's agenda without a rulemaking step, MSHA now projects this two-year schedule:
 
 
 33
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 34
 Close of Comment Period on June 3, 1985
 Advance Notice of Proposed
 Rulemaking (ANPR)
Completion of Review of August 1985
 Comments on ANPR
Circulation of Preproposal November 1985
 Draft for Public Comment
Close of Comment Period on February 1986
 Preproposal Draft
Completion of Review of April 1986
 Comments on Preproposal
 Draft
Publication of Notice of July 1986
 Proposed Rulemaking
Close of Comment Period on October 1986
 Proposed Rule
Publication of Notice of Public December 1986
 Hearing with Statement of
 Issues Raised
Public Hearing February 1987
Publication of Final Rule June 1987
 
 
 35
 Post-Argument Statement of the Federal Respondents at 1-2.
 
 
 36
 Petitioners remind us that MSHA "has nominally been working on a revision to its radon daughter standards for over five years," Petitioners' Response to the Post-Argument Statement of the Federal Respondents at 1; they urge us to direct the agency to complete the rulemaking within eighteen months. Id. at 2. Specifically, petitioners attack as unnecessary and duplicative MSHA's provision for a preproposal draft stage spanning several months.
 
 
 37
 Our opinion in TRAC, citing earlier precedent, instructs that "the time agencies take to make decisions must be governed by a 'rule of reason.' " 750 F.2d at 80; see MCI Telecommunications Corp. v. FCC, 627 F.2d 322, 340 (D.C.Cir.1980) (reasonable time may encompass "months, occasionally a year or two, but not several years or a decade"). Relevant considerations include congressional indications of the pace at which the agency should proceed, the bearing of the decision on human health and welfare, and "the effect of expediting delayed action on agency activities of a higher or competing priority." TRAC, 750 F.2d at 80.
 
 
 38
 In this case, there are indications in the legislative history of the Mine Act that Congress did not expect MSHA to tarry for years over its health and safety rulemakings. See, e.g., H.R.REP. NO. 312, 95th Cong., 1st Sess. 17-18 (1977) (to prevent delay in promulgating standards the Mine Act itself includes some rulemaking deadlines). Moreover, human life and health are at stake. In addition, the listing of MSHA's current rulemaking (and rule withdrawal) activities, as furnished to the court, does not demonstrate that expediting the radiation standards rulemaking is likely to crowd out agency action on items of higher priority. See 50 Fed.Reg. 17,444-51 (1985).
 
 
 39
 We are cognizant, however, of the complex scientific and technical issues involved in deciding whether to revise the current standards and in formulating a revision.[14] The difficulty and uncertainty inherent in the venture caution us against second-guessing MSHA's judgment that its ultimate disposition will be facilitated by including in the rulemaking process a preproposal draft stage. Cf. Public Citizen Health Research Group v. Auchter, 702 F.2d 1150, 1156 (D.C.Cir.1983) (per curiam) (courts owe respect to expert agency's judgments in arriving at essentially legislative decisions involving considerations of policy and entailing complex, often incomplete, scientific information). MSHA has represented to us that it has utilized preproposal drafts consistently and successfully "during the past several years," Post-Argument Statement of the Federal Respondents at 3; further, the agency cites congressional awareness of the procedure. S.REP. NO. 181, 95th Cong., 1st Sess. 19 (1977) ("Preproposal consultation often has been a useful tool...."). In view of MSHA's submissions following oral argument, including its representation that the agency is indeed engaged in "an effort ... to advance the rulemaking process" while securing "public participation" and "careful consideration of the many technical issues involved," Post-Argument Statement of the Federal Respondents at 2, we cannot say that the two-year course projected adds up to unreasonable delay.
 
 CONCLUSION
 
 40
 We are satisfied that MSHA is now proceeding toward completion of its rulemaking within a reasonable time; there is accordingly no need, at this juncture, for a court order compelling agency action unreasonably delayed. We add that if MSHA should fail to act with appropriate diligence in following the estimates it has tendered to this court, petitioners may invoke our authority to direct MSHA to complete the rulemaking process with due dispatch. See International Union, United Automobile, Aerospace & Agricultural Implement Workers v. Donovan, 756 F.2d 162, 165 (D.C.Cir.1985) (court will scrutinize variance from schedule and set day certain for completion of rulemaking proceedings if officials unreasonably delay); cf. United Steelworkers v. Marshall, 647 F.2d 1189, 1266 (D.C.Cir.1980) (agency charged with responsibility for protecting workers should not await "the Godot of scientific certainty"), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).
 
 
 41
 For the foregoing reasons, the petition for review is dismissed without prejudice to renewal should circumstances so warrant.
 
 
 42
 It is so ordered.
 
 
 
 [1]
 OCAW, a labor organization, alleges that it represents hundreds of uranium miners. PCHRG is a non-profit organization engaged in research and advocacy on health and safety matters, including mine safety
 
 
 [2]
 Respondents designated by petitioners are the Assistant Secretary of Labor for Mine Safety and Health; MSHA, an agency within the Department of Labor; and the (Under) Secretary of Labor
 
 
 [3]
 AMC is an industry association that represents producers of most of the nation's coal, uranium, metals, and industrial and agricultural minerals
 
 
 [4]
 The emergency temporary mandatory standard (ETMS) provision of the Mine Act reads:
 (1) The Secretary shall provide ... for an emergency temporary mandatory health or safety standard to take immediate effect upon publication in the Federal Register if he determines (A) that miners are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful, or to other hazards, and (B) that such emergency standard is necessary to protect miners from such danger.
 (2) A temporary mandatory health or safety standard shall be effective until superseded by a mandatory standard promulgated in accordance with the procedures prescribed in paragraph (3) of this subsection.
 (3) Upon publication of such standard in the Federal Register, the Secretary shall commence a [rulemaking] proceeding in accordance with subsection (a) of this section, and the standards as published shall also serve as a proposed rule for the proceeding. The Secretary shall promulgate a mandatory health or safety standard under this paragraph no later than nine months after publication of the emergency temporary standard as provided in paragraph (2).
 30 U.S.C. Sec. 811(b) (1982). This Mine Act provision tracks the emergency temporary standard provision of the Occupational Safety and Health Act, 29 U.S.C. Sec. 655(c) (1982), a provision this court addressed in a case bearing a considerable resemblance to the one at bar: Public Citizen Health Research Group v. Auchter, 702 F.2d 1150 (D.C.Cir.1983) (per curiam).
 OCAW and PCHRG sought an ETMS lowering the permissible radon daughter exposure from 4 WLM to .7 WLM per year.
 
 
 [5]
 The National Institute for Occupational Safety and Health is an arm of the Centers for Disease Control which, in turn, are part of the Public Health Service, an agency within the Department of Health and Human Services. NIOSH has no authority to promulgate or enforce standards, but is responsible for conducting research and making recommendations to standard-setting agencies. See 29 U.S.C. Sec. 671 (1982) (establishing agency). In particular, NIOSH may recommend the promulgation of new mine safety standards. See 30 id. Sec. 811(a)(1)
 
 
 [6]
 MSHA observed in its brief to this court: "To this date, NIOSH has not submitted a final literature evaluation or quantitative risk assessment." Brief for the Secretary of Labor and Other Federal Respondents at 12
 
 
 [7]
 The venerable "All Writs" provision reads:
 The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.
 
 
 [8]
 We find implausible the contention that Congress, although cutting the Mine Act rulemaking provisions (30 U.S.C. Sec. 811 (1982)) from the pattern used in the Occupational Safety and Health Act, see 29 U.S.C. Sec. 655 (1982), nonetheless meant to brigade MSHA against delay-in-rulemaking claims of the kind to which a sister agency, the Occupational Safety and Health Administration (OSHA), stands exposed. See International Union, United Automobile, Aerospace & Agricultural Implement Workers v. Donovan, 756 F.2d 162 (D.C.Cir.1985) (challenge to OSHA regarding regulation of exposure to formaldehyde). At oral argument, counsel for the federal respondents acknowledged that she had come upon nothing in the legislative history of the two Acts indicating that Congress intended to distinguish, for judicial review purposes, undue delay at MSHA from undue delay at OSHA
 
 
 [9]
 The APA definition reads:
 "[O]rder" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making....
 
 
 [10]
 The provision contained in 30 U.S.C. Sec. 956 originated as a section of the Federal Coal Mine Health and Safety Act of 1969, Pub.L. No. 91-173, Sec. 507, 83 Stat. 742, 803. That Act delineated separately enforcement and standard-setting functions, and used the "order, notice, decision" terminology in conjunction with the former function. Compare id. Sec. 104(b), 83 Stat. at 751 (when violation of standard is found on inspection of a mine, "notice" shall issue to operator), and id. Sec. 104(c)(1), 83 Stat. at 751 (if second infraction is found, an "order" shall issue), and id. Sec. 105(b), 83 Stat. at 753 (Secretary, on receiving report of investigation, shall issue a written "decision"), with id. Sec. 101(a), 83 Stat. at 745 (Secretary shall develop, promulgate, and revise safety "standards")
 Similar usage of "order, notice, decision" terminology continues in the 1977 Mine Act. Compare 30 U.S.C. Secs. 813-819 (1982) (references to "notice," "citation," "order," "decision" in conjunction with inspection-investigation enforcement activities) with id. Sec. 811(a) (development, promulgation, and revision of health and safety "standards").
 
 
 [11]
 Under the Mine Act, review of MSHA's rulemaking follows a standard, direct path from agency to court of appeals. See 30 U.S.C. Sec. 811(d) (1982). Enforcement controversies, however, are aired before an independent administrative tribunal, the Federal Mine Safety and Health Review Commission, prior to court review. See id. Secs. 815-816, 823; see also id. Sec. 818 (district court jurisdiction over certain injunctive actions to compel compliance with Act's requirements)
 
 
 [12]
 The scant legislative history of the provision for nonapplication of the APA to an "order, notice, or decision" is entirely consistent with the view that Congress had in mind not rulemaking, but only the comprehensive enforcement scheme it had ordered. See S.REP. NO. 411, 91st Cong., 1st Sess. 96 (1969) (section provides that APA provisions "would not apply to orders or decisions issued under this act because the act prescribes the procedures to be followed")
 
 
 [13]
 In response to the suggestion that petitioners, having asked at the outset for an ETMS, are blocked from now pressing a more modest claim, it suffices to note petitioners' standard plea for "such other and further appropriate relief as may be just and proper." J.A. 25; see also FED.R.CIV.P. 54(c) (authorizing relief to which party is entitled "even if the party has not demanded such relief in his pleadings")
 
 
 [14]
 These issues are spread out at length in the parties' conflicting presentations; they include: the technological feasibility of a lowered standard for radon daughters, see, e.g., J.A. 295-97, 369-74 (joint affidavits filed by AMC criticizing standard proposed by petitioners); the level of exposure currently experienced by miners, compare, e.g., Brief for the Secretary of Labor and Other Federal Respondents at 41, 45, with Petitioners' Reply Brief at A15-A16; and the tightness of the link between exposure to radon daughters and respiratory cancer, see, e.g., Brief for the Secretary of Labor and Other Federal Respondents at 64-71