**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE A COMMUNITY VOICE; CALIFORNIA COMMUNITIES AGAINST TOXICS; HEALTHY HOMES COLLABORATIVE; NEW JERSEY CITIZEN ACTION; NEW YORK CITY COALITION TO END LEAD POISONING; SIERRA CLUB; UNITED PARENTS AGAINST LEAD NATIONAL; WE ACT FOR ENVIRONMENTAL JUSTICE, | No. 16-72816 |
| | OPINION |
| A COMMUNITY VOICE; CALIFORNIA COMMUNITIES AGAINST TOXICS; HEALTHY HOMES COLLABORATIVE; NEW JERSEY CITIZEN ACTION; NEW YORK CITY COALITION TO END LEAD POISONING; SIERRA CLUB; UNITED PARENTS AGAINST LEAD NATIONAL; WE ACT FOR ENVIRONMENTAL JUSTICE, *Petitioners*, | |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *Respondent.* | |

Appeal from the United States District Court
for the Northern District of California

Argued and Submitted June 12, 2017
San Francisco, California

Filed December 27, 2017

Before:  Mary M. Schroeder and N. Randy Smith, Circuit
Judges, and Lawrence L. Piersol,* District Judge.

Opinion by Judge Schroeder;
Dissent by Judge N.R. Smith

---

*The Honorable Lawrence L. Piersol, United States District Judge for
the District of South Dakota, sitting by designation.

## SUMMARY[**]

---

### Mandamus / Environmental Protection Agency

The panel granted a petition for writ of mandamus brought by environmental groups seeking to compel the United States Environmental Protection Act ("EPA") to act upon a rulemaking petition it granted years ago concerning dust-lead hazard and lead-paint standards.

The panel held that it had jurisdiction to consider the mandamus petition because three of the petitioners were California residents, and they challenged a final EPA rule.

The panel held that the EPA was under a duty stemming from the Toxic Substances Control Act and the Residential Lead-Based Pain Hazard Reduction Act of 1992 to update lead-based paint and dust-lead hazard standards in light of the obvious need, and a duty under the Administrative Procedure Act to fully respond to petitioners' rulemaking petition.

The panel held that in cases seeking mandamus, the issue of whether the agency unreasonably delayed is evaluated under the factors outlined in *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("*TRAC*"). The panel held that the clear balance of the *TRAC* factors favored issuance of the writ. The panel further held that D.C. Circuit cases buttressed this conclusion. The panel, accordingly, granted the petition for a writ of mandamus.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel turned to the question of the contents of the writ. The panel ordered (1) that EPA issue a proposed rule within ninety days of the date that this decision became final; (2) that EPA promulgate the final rule within one year after the promulgation of the proposed rule; and (3) that the deadlines for both the proposed rule and final rule would only be modified if EPA presented new information showing modification was required.

The court retained jurisdiction for purposes of ensuring compliance until EPA issued a final order subject to judicial review.

Judge N. R. Smith dissented because he would hold that neither the Toxic Substances Control Act and the amendments in the Paint Hazard Act nor the Administrative Procedures Act mandated the EPA to act, and the majority therefore improperly granted a writ of mandamus.

**COUNSEL**

Hannah Chang (argued), Eve C. Gartner, and Jonathan J. Smith, Earthjustice, New York, New York, for Petitioners.

Rochelle L. Russell (argued), Trial Attorney, Environment Defense Section; John C. Cruden, Assistant Attorney General, Environment & Natural Resources Division; United States Department of Justice, San Francisco, California; for Respondent.

## OPINION

SCHROEDER, Circuit Judge:

## INTRODUCTION

This case is about the hazards of lead paint in home environments that have been found by scientists to be more dangerous to childrens' health than earlier supposed. It is an action in the form of an original petition for writ of mandamus to compel the Environmental Protection Agency ("EPA") to act upon a rulemaking petition it granted eight years ago. The agency does not challenge the science supporting Petitioners' concerns, but contends its only duty under the statute is to begin a rulemaking proceeding, and that it has no responsibility to make any decisions within a reasonable time or ever. The issues before us are essentially two: whether the agency has a duty to act and, if so, whether the delay has been unreasonable.

In determining these issues, we look to the relevant statutory provisions, the controlling law of this circuit and the more developed law of the District of Columbia Circuit. All strongly support granting the petition.

## I.  Background

In 1992, Congress set out a comprehensive scheme to regulate, and eventually eliminate, the risk of lead poisoning in children from pre-1978 structures, those built before lead-based paint was banned for consumer use. Residential Lead-Based Paint Hazard Reduction Act of 1992, Pub L. 102-550, 106 Stat. 3672 ("Paint Hazard Act"). As part of this program,

Congress identified two types of lead risks that needed to be regulated, lead-based paint itself, and dust-lead hazards.

Congress delegated to the EPA sole authority to establish national actionable dust-lead hazard standards. 15 U.S.C. § 2683. Congress established an initial standard for lead-based paint, and then divided authority between EPA and the Department of Housing and Urban Development ("HUD") to adjust the standard lower as needed in the future, with HUD given jurisdiction to set standards for "target housing," i.e., public housing, and EPA given jurisdiction for all other locations. *Id.* § 2681(9). The initial definition of lead-based paint was paint that contained "1.0 milligrams [of lead] per centimeter squared or 0.5 percent by weight." *Id.*

Though EPA was instructed by statute to issue its initial rules identifying dust-lead hazards within eighteen months of October 28, 1992, the rules were not finalized until 2001, when EPA identified the dust lead hazard for all "[c]hild-occupied facilities." It did so in terms of micrograms per square foot, abbreviated as "$\mu g/ft^2$." EPA established standards for floors and window sills as "40 $\mu g/ft^2$ on floors or 250 $\mu g/ft^2$ on interior window sills." 40 C.F.R. § 745.65(b). Based on then available science, EPA estimated that those standards would result in a one to five percent chance of a child developing a blood lead level of 10 micrograms per deciliter ("$\mu g/dL$"), which was then believed to be the safe blood lead level. Identification of Dangerous Levels of Lead, 66 Fed. Reg. 1206, 1215 (Jan. 5, 2001).

Since January of 2001, scientific research has further advanced our understanding of the dangerousness of lead, yet the EPA's standards have not changed. In 2007, EPA's Clean

Air Scientific Advisory Committee informed the agency that the dust-lead hazard standards were "insufficiently protective of children's health." In 2012, the Center for Disease Control ("CDC") acknowledged that there is no known safe blood lead level. CDC determined that 5 μg/dL, or half EPA's target level, should be sufficient to trigger a public health response, what they described as the "level of concern." The American Academy of Pediatrics has said that the current dust-lead hazard standards allow some fifty percent of all children to have a blood lead level above the level of concern, and that EPA's current standards are obsolete. The lead-based paint standard set out originally by Congress also appears to be too high to provide a sufficient level of safety. EPA does not appear to dispute the factual record developed by Petitioners showing that, according to modern scientific understanding, neither the dust-lead hazard standard nor the lead-based paint standard are sufficient to protect children. Since the petition was filed, HUD has published guidelines lowering the acceptable dust-lead hazard standard in public housing for floors and window sills to the levels Petitioners asked for in this case.

By 2009 those worried about environmental hazards to childrens' health were concerned that the standards were too lenient. Of the eight current Petitioners, four (Healthy Homes Collaborative, New Jersey Citizen Action, Sierra Club, and United Parents Against Lead) filed an administrative petition with the EPA on August 10, 2009. The petition asked the EPA to use its rulemaking authority to "more adequately protect . . . children," specifically by lowering the dust-lead hazard standards to 10 $\mu g/ft^2$ for floors and 100 $\mu g/ft^2$ for window sills, and to lower the standard for lead-based paint to 0.06 percent lead by weight. After a notice and comment period on the petition, EPA sent the Petitioners a letter on

October 22, 2009, "grant[ing] [their] request" for a rulemaking, though without a commitment to a specific rulemaking outcome (e.g., adoption of the standards sought by Petitioners) or a specific date certain for promulgation of the rule. EPA noted that because it shared jurisdiction with HUD over lead-based paint, it would work with HUD on that aspect of the petition. This letter is the last direct communication any of the Petitioners received from EPA prior to their filing this mandamus petition.

In the meantime, both publicly and privately, however, EPA appears to have done some work. In 2010, EPA formed a Science Advisory Board Lead Review Panel ("SAB Panel") to provide advice on the process. EPA sent the SAB Panel a proposed methodology for dust-lead hazard standards in June 2010, and soon received comments noting that the approach was reasonable. In November of 2010, EPA sent the SAB Panel an updated proposed methodology which the SAB Panel again signed off on. In 2011, EPA performed a literature review which determined that technology was developed and feasible for detecting lower levels of dust lead. The EPA also coordinated with HUD to develop a survey of target housing to determine whether lower lead clearance levels were feasible. The survey was developed by June of 2012, authorized in May of 2014, and completed in October of 2015. The survey indicated that lower lead clearance levels were in fact feasible. EPA acknowledges it received the survey results, but that appears to have been the last action that EPA has taken.

Petitioners filed this mandamus petition about nine months later, in August of 2016, asking this court to hold that EPA has unreasonably delayed promulgation of the promised rule, and asking that this court compel EPA to issue a

proposed and final rule in the near future. EPA responded that it has been working diligently and that mandamus is unnecessary. EPA estimated that a proposed rule might be ready to be issued in 2021, and that a final rule could come in 2023.

This court's jurisdiction to consider this petition is dependent on our jurisdiction to review a final rule. Final EPA rules may be reviewed in either the Court of Appeals for the D.C. Circuit, or any Court of Appeals for a circuit where any petitioner resides or has its principle place of business. 15 U.S.C. § 2618(a). Any court that would have jurisdiction to review a final rule has jurisdiction to determine if an agency's delay is unreasonable. *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("*TRAC*"). Three of the Petitioners (California Communities Against Toxics, Healthy Homes Collaborative, and Sierra Club) have their principle place of business in California, and thus jurisdiction would be proper in this court if they were challenging a final rule. Under the All Writs Act, this court is allowed to issue all writs appropriate "in aid of [our] respective jurisdiction[]." 28 U.S.C. § 1651(a). We therefore have jurisdiction to consider this mandamus petition.

When deciding whether to grant a mandamus petition on the grounds of unreasonable delay, this court applies the six factor balancing test set out by the D.C. Circuit in *TRAC*. *See Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (adopting the so-called *TRAC* factors). Of course, an agency cannot unreasonably delay that which it is not required to do, so the first step before applying the *TRAC* factors is necessarily to determine whether the agency is required to act, that is whether it is under a duty to act. *See*

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 n.1 (2004). It is to the question of duty we turn first.

## II.  Duty

Petitioners point to two statutory frameworks they contend create a duty for the EPA to act.  First, they argue there is a clear duty under the Toxic Substances Control Act ("TSCA") and the amendments to it from the Paint Hazard Act.  Second, they argue that the Administrative Procedure Act ("APA") itself places a clear duty on EPA to take final action on their 2009 petition.  We agree with Petitioners that a duty to act can be found in both.

In enacting the Paint Hazard Act, Congress was clear about what it wanted: to "prevent childhood lead poisoning" and "eliminate lead-based paint hazards in all housing as expeditiously as possible."  42 U.S.C. § 4851a(1), (3).  EPA was instructed to "identify" whatever might constitute a "lead-based paint hazard," that Congress defined as a "condition that causes exposure to lead . . . that would result in adverse human health effects."  15 U.S.C. §§ 2681(10), 2683.  The TSCA further makes clear that this is an ongoing duty, authorizing EPA to amend any regulations when necessary, including in the case of lead-based paint, amending the initial standard authorized by Congress.  *Id.* § 2687.  Further, Congress specifically demanded the creation of a task force that would be instructed to advise EPA and HUD as to "revising . . . regulations . . . issued by [HUD] and other Federal agencies relating to lead-based paint poisoning prevention."  42 U.S.C. § 4852a(a), (c)(5).

This statutory framework clearly indicates that Congress did not want EPA to set initial standards and then walk away,

but to engage in an ongoing process, accounting for new information, and to modify initial standards when necessary to further Congress's intent: to prevent childhood lead poisoning and eliminate lead-based paint hazards. Despite the dissent's attempt to recharacterize congressional intent, Congress did not simply state a goal when enacting the TSCA and the Paint Hazard Act; Congress established statutory standards that the EPA must enforce. 15 U.S.C. § 2683 ("Within 18 months after October 28, 1992, the Administrator shall promulgate regulations which shall identify, for purposes of this subchapter and the [Paint Hazard Act], lead-based paint hazards, lead-contaminated dust, and lead-contaminated soil."); *id.* § 2687 ("The regulations may be amended from time to time as necessary."). The EPA does not dispute that now available information shows the insufficiency of its present standards for achieving Congress's purposes.

Moreover, even if we could conclude the EPA had no duty to act under the TSCA and the Paint Hazard Act, the EPA has a clear duty to act under the APA. The APA requires agencies to "conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). This has been interpreted to mean that an agency has a duty to fully respond to matters that are presented to it under its internal processes. *See In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004). The Petitioners' 2009 petition is such a matter.

EPA argues that it has already done everything this duty requires it to do by, in its words, "begin[ning] an appropriate proceeding." In EPA's view, that is the only commitment to the Petitioners the agency made when it granted the August 2009 petition. The 2009 petition, however, did not petition

EPA to begin a proceeding; it petitioned EPA to engage in rulemaking to lower the lead standards. The Petitioners also provided their view of what reasonable lead standards would be. EPA granted this petition for a rulemaking, though not promising a specific timeline or to specifically adopt the outcome offered by the Petitioners. Under these circumstances, EPA is under a clear duty to act.

Under the applicable law, the EPA has to reach some final decision. To "conclude [the] matter," EPA must enter a final decision subject to judicial review, and they must do so "within a reasonable time." 5 U.S.C. §555(b); *see Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 724 F. Supp. 1013, 1020 (D. D.C. 1989) ("Once an agency decides to take a particular action, a duty to do so within a reasonable time is created."). An agency "cannot simply refuse to exercise [its] discretion" to conclude a matter. *Indep. Mining Co.*, 105 F.3d at 507 n.6. Having chosen to grant the petition for rulemaking, EPA came under a duty to conclude a rulemaking proceeding within a reasonable time. The agency does not comply with that duty merely by "begin[ning] an appropriate proceeding."

Support for the existence of a clear duty under these circumstances is found in analogous D.C. Circuit cases regarding the Occupational Safety and Health Administration ("OSHA"). The D.C. Circuit has held that when Congress creates an initial standard but grants OSHA regulatory authority to amend the standard, OSHA is under a duty to act where there is an "obvious need, apparent to OSHA" to alter the initial standard in light of new information. *Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1154, 1158 (D.C. Cir. 1983) (per curiam). The D.C. Circuit has further held that an agency must, under the APA, "conclude within

a reasonable time a matter presented to it." *Id.* at 1153–54 (alterations omitted); *see also In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (per curiam).

These principles apply here. Under the TSCA and the Paint Hazard Act, Congress set EPA a task, authorized EPA to engage in rulemaking to accomplish that task, and set up a framework for EPA to amend initial rules and standards in light of new information. The new information is clear in this record: the current standards for dust-lead hazard and lead-based paint hazard are insufficient to accomplish Congress's goal, thereby creating an "obvious need, apparent to [the EPA.]" *See Pub. Citizen Health Research Grp.*, 702 F.2d at 1154. Furthermore, because the EPA granted the Petitioners' rulemaking petition, it came under a duty to conclude the rulemaking proceeding within a reasonable time. *See id.*; *In re Int'l Chem. Workers Union*, 958 F.2d at 1150. The dissent refuses even to acknowledge the conflict its position creates with these principles.

We also note that failing to find a duty would create a perverse incentive for the EPA. In our court's most recent unreasonable delay case, we granted mandamus where the EPA had not responded to an administrative petition for rulemaking after eight years. *See Pesticide Action Network N. Am. v. EPA*, 798 F.3d 809 (9th Cir. 2015). The EPA distinguishes that case on the ground that here it has responded by granting this petition. Under the EPA's view, were it not to respond to the petition at all, this court could grant mandamus and compel a time table for rulemaking, yet if EPA "grants" the petition it can then delay indefinitely, without any recourse to the Petitioners. This would allow the EPA to grant petitions for rulemaking and take no action in order to avoid judicial review. The dissent's position that the

EPA is under no duty to act leaves the agency unaccountable and our children unsafe.

We thus conclude the EPA is under a duty stemming from the TSCA and the Paint Hazard Act to update lead-based paint and dust-lead hazard standards in light of the obvious need, and a duty under the APA to fully respond to Petitioners' rulemaking petition. A writ of mandamus is appropriate if Petitioners have made a showing that the delay has been unreasonable. We turn to that question now.

## III.    Unreasonable Delay

In this circuit, in cases seeking mandamus, unreasonable delay is evaluated under the *TRAC* factors. *See Indep. Mining Co.*, 105 F.3d at 507. There are six *TRAC* factors:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking

> behind agency lassitude in order to hold that
> agency action is unreasonably delayed.

750 F.2d at 80 (citations and internal quotation marks omitted).  The most important is the first factor, the "rule of reason," though it, like the others, is not itself determinative.  *See In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008).  We have to consider them all.

This court has discussed the *TRAC* factors in at least three unreasonable delay mandamus cases.  Most recently, we granted the writ in *Pesticide Action*.  There, the petitioners sought a rulemaking from the EPA that would revoke the approval of a particular pesticide, chlorpyrifos.  *Pesticide Action Network N. Am.*, 793 F.3d at 811.  The EPA had not acted.  *Id.*  This court focused on the first and third *TRAC* factors, both of which favored granting the writ.  *Id.* at 814.  With regard to the third factor, we noted that "EPA's own assessment" was that the pesticide presented "dangers to human health."  *Id.*  With regard to the rule of reason, we noted that EPA had been considering the petition for eight years, and EPA stated only that it intended to issue a proposed rule after yet another year had passed.  *Id.*  We held that after eight years and without a "'concrete timeline' for resolving the petition," but only a "roadmap for further delay," EPA had "stretched the 'rule of reason' beyond its limits."  *Id.*  This case is similar in the length of delay, absence of a reasonable timetable, and harm to health.

EPA eventually filed its response to its petition by denying it, thus complying with our order and allowing petitioners access to administrative review, which may be followed by judicial review of the substance.  *See Pesticide Action Network N. Am.*, 863 F.3d at 1132–33.

In our two other cases, claiming unreasonable delay, we denied the petition.  In *California Power Exchange*, petitioners sought to compel the Federal Energy Regulatory Commission to issue a final order regarding outstanding refund requests, but a mere four months after the requests were made.  245 F.3d 1110, 1125 (9th Cir. 2001).  We declined, noting that unreasonable delays under the *TRAC* factors "involve[] delays of years, not months." *Id.*  And in *Independence Mining*, petitioner sought mandamus relief after two to three years of waiting for the Secretary of the Interior to act on its mineral patent claims.  105 F.3d at 505. We rejected the petitioner's argument that the rule of reason favored it, in part because Congress had recently expressly given the Secretary of the Interior five years to resolve outstanding applications.  *Id.* at 509.  We also rejected the petitioner's argument that the third (human welfare) and fifth (interests prejudiced) factors favored issuing the writ, due to the uncertainty over its mining claims and in view of the mines' employment of 600 people.  *Id.* at 509–10.  We noted that the patents were unnecessary for the company to continue to operate and employ its workers, and the company had provided no evidence that employees' jobs were at risk, or that there were any real interests prejudiced by the delay. *Id.*

Our case law thus supports our holding that the *TRAC* factors favor issuance of the writ in this case.  As in *Pesticide Action*, EPA's delay here is into its eighth year, and EPA has not offered a "concrete timetable" for final action, but only speculative dates four and six years in the future when it might take final action.  This is not a case like *Independence Mining* or *California Power Exchange* where the delay has been only months or a few years.  Further, like *Pesticide Action*, and unlike *Independence Mining* or *California Power*

*Exchange*, there is a clear threat to human welfare; indeed EPA itself has acknowledged that "[l]ead poisoning is the number one environmental health threat in the U.S. for children ages 6 and younger" and that the current standards are insufficient. The children exposed to lead poisoning due to the failure of EPA to act are severely prejudiced by EPA's delay, and the fifth factor thus favors issuance of the writ. Finally, Congress has asserted that the threat of lead poisoning must be eliminated expeditiously, and thus the second *TRAC* factor also favors the issuance of the writ. Even assuming that EPA has numerous competing priorities under the fourth factor and has acted in good faith under the sixth factor, the clear balance of the *TRAC* factors favors issuance of the writ.

Cases from the D.C. Circuit buttress this conclusion. The D.C. Circuit has noted that "a reasonable time for agency action is typically counted in weeks or months, not years" and thus a "six-year-plus delay is nothing less than egregious." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 419. On the other hand, a "14-month time period" without more is not unreasonable. *United Steelworkers of Am. v. Rubbers Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986). Other D.C. Circuit cases largely fall into this pattern. *See, e.g.*, *In re Int'l Chem. Workers Union*, 958 F.2d at 1150 (six year delay unreasonable for rulemaking); *In re Core Commc'ns Inc.*, 531 F.3d at 857 (same); *In re Bluewater Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (nine year delay unreasonable). Critically, EPA fails to identify a single case where a court has upheld an eight year delay as reasonable, let alone a fourteen year delay, if we take into account the six more years EPA asserts it needs to take action.

Therefore, we grant the petition for the writ of mandamus.

**IV.     Remedy**

Having determined that Petitioners are entitled to mandamus, we now turn to the question of the contents of the writ.  Petitioners ask that we order EPA to issue a proposed rule within ninety days and a final rule within six months. EPA does not provide an alternative timeline, other than its vague intention to issue a proposed rule in four years and a final rule in six, a timeline we hold to be unreasonable.

In *Pesticide Action*, we ordered the EPA to issue a proposed rule in ninety days, and to provide a timeline for a final rule at that time.  798 F.3d at 815.  We also look to the D.C. Circuit, which has more frequently dealt with unreasonably delayed rulemakings.  In *International Chemical Workers Union*, the D.C. Circuit granted mandamus on March 20, 1992, and ordered OSHA to submit a final rule by August 31, 1992.  958 F.2d at 1150.  In *Public Citizen Health Research Group*, the D.C. Circuit ordered OSHA to issue a notice of proposed rulemaking within thirty days and to expedite the final rule on a priority basis, earlier than OSHA's estimate of one and a half years.  702 F.2d at 1159.  Using an alternative device, in *In re United Mine Workers of America International Union*, 190 F.3d 545, 556 (D.C. Cir. 1999), the D.C. Circuit granted mandamus and ordered the Mine Safety and Health Administration to issue periodic status reports on its progress toward promulgation of a final rule.  All these cases make it clear that when there has been an unreasonable delay in rulemaking, courts have power and discretion to enforce compliance within some form of timeline.

EPA does not dispute this court's authority, but argues that the timeline sought by the Petitioners, ninety days for a

proposed rule and six months for a final rule, would force EPA to act without due deliberation.

We are mindful of the need for EPA to issue a well-conceived rule, and not merely a rule, and that new issues may arise during a notice and comment period that demand further study; we are also mindful that we lack expertise in fashioning timetables for rulemaking. We must observe, however, that EPA has already taken eight years, wants to delay at least six more, and has disavowed any interest in working with Petitioners to develop an appropriate timeline through mediation. We are also mindful of the severe risks to children of lead-poisoning under EPA's admittedly insufficient standards. These circumstances are reminiscent of the circumstances we confronted in *Pesticide Action*, and thus we issue a timeline to the EPA materially similar to the one issued there with respect to the promulgation of a proposed rule and permitting of the possibility of timeline modification.

Accordingly, we order (1) that EPA issue a proposed rule within ninety days of the date that this decision becomes final; (2) that EPA promulgate the final rule within one year after the promulgation of the proposed rule; and (3) that the deadlines for both the proposed rule and the final rule will only be modified if EPA presents new information showing modification is required. This court retains jurisdiction for purposes of ensuring compliance until EPA issues a final order subject to judicial review.

The petition for writ of mandamus is **GRANTED.**

N.R. SMITH, Circuit Judge, dissenting:

Because neither the Toxic Substances Control Act and the amendments in the Paint Hazard Act (collectively referred to as "TSCA") nor the Administrative Procedures Act ("APA") mandates the Environmental Protection Agency ("EPA") to act, the majority improperly granted a writ of mandamus. Therefore, I must dissent.

## I.

A writ of mandamus is a "drastic [remedy], to be invoked only in extraordinary situations." *Kerr v. U. S. Dist. Court for N. Dist. of California*, 426 U.S. 394, 402 (1976). "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Id.* Here, Plaintiffs failed to satisfy their burden of proving that the EPA had a clear duty to act under the TSCA or the APA, thus entitling Plaintiffs to clear and indisputable relief. Therefore, we lack jurisdiction to grant the writ. Let me explain why granting this drastic remedy was in error.

## A.

The majority first finds a clear duty to act in the TSCA. Let us examine that premise. In enacting the TSCA, Congress was clear about its purpose: "to develop a national strategy to build the infrastructure necessary to eliminate

lead-based paint hazards in all housing as expeditiously as possible"; and "to encourage effective action to prevent childhood lead poisoning by establishing a workable framework for lead-based paint hazard evaluation and reduction and by ending the current confusion over reasonable standards of care."  42 U.S.C. § 4851a(1), (3). Congress further articulated that "the Federal Government must take a leadership role in building the infrastructure— including an informed public, State and local delivery systems, certified inspectors, contractors, and laboratories, trained workers, and available financing and insurance— necessary to ensure that the national goal of eliminating lead-based paint hazards in housing can be achieved as expeditiously as possible."  42 U.S.C. § 4851(8).  However, "as any student of the legislative process soon learns, it is one thing for Congress to announce a grand goal, and quite another for it to mandate full implementation of that goal." *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 178 (D.C. Cir. 1982).

Thus, in order to issue a writ of mandamus, we must examine the language of the TSCA to determine whether there is a Congressional mandate for the EPA to act.  The language of the TSCA evidences that Congress mandated that the EPA "promulgate regulations which shall identify . . . lead-based paint hazards, lead-contaminated dust, and lead-contaminated soil," "[w]ithin 18 months after October 28, 1992." 15 U.S.C. § 2683.  Everyone agrees that the EPA met that mandate.  The majority relies on Congress's "findings," 42 U.S.C. § 4851, and "purposes," § 4851a, to conclude that Congress mandated a further duty.  Examining the language of these statutes, they do not mandate a duty to act; they merely outline the "grand goals" of Congress.  As a general rule in statutory interpretation, "[p]reambles to statutes do not

impose substantive rights, duties or obligations." *Nat'l Wildlife Fed'n v. Marsh*, 721 F.2d 767, 773 (11th Cir. 1983) (citing *Ass'n of Am. RRs v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977); *Alexander v. HUD*, 555 F.2d 166, 171 (7th Cir. 1977)). Nothing in the TSCA or related statutes (beyond the preamble) outlines a further duty to act to implement those goals.

Despite the majority's reliance on "findings" and "purposes," Congress did not mandate an ongoing duty with regard to promulgating regulations in order to reach the stated purpose of "eliminat[ing] lead-based paint hazards," 42 U.S.C. § 4851a(1). Instead, the language of the TSCA evidences that Congress made further regulation (after 1994) discretionary. Congress said, "The regulations *may* be amended from time to time as necessary."[1] 15 U.S.C. § 2687 (emphasis added). The majority correctly noted that Congress mandated that a task force be created to make recommendations concerning "revising guidelines, regulations, and educational pamphlets issued by the Department of Housing and Urban Development and other Federal agencies relating to lead-based paint poisoning prevention." 42 U.S.C.§ 4852a(a), (c)(5). However, Congress did not even mandate that the EPA accept or act on those task force recommendations nor did Congress alter the discretionary language of 15 U.S.C. § 2687 regarding the EPA's duty to act in promulgating regulations. Despite these stated goals ("findings" and "purposes"), there is nothing in

---

[1] The majority suggests that "Congress did not want EPA to set initial standards and then walk away." Maj. Op. 10. Even assuming that Congress *desired* the EPA "to engage in an ongoing process . . . to modify initial standards when necessary to further Congress's intent," it nevertheless saw fit not to require the EPA to act.

the plain language of the TSCA, which mandates that EPA has a continuing duty to implement regulations to meet the goals. *Cf. Tashima v. Admin. Office of U.S. Courts*, 967 F.2d 1264, 1271 (9th Cir. 1992) (noting that "the use of the term 'may' bars a finding that the statute establishes a clear unambiguous duty . . . , and thus bars a mandamus action"); *see also United States v. Rodgers*, 461 U.S. 677, 706 (1983) (explaining that "[t]he word 'may,' when used in a statute, usually implies some degree of discretion").

Although it is tempting to interpret Congress's use of the term "may" to create a duty in light of Congress's broad "purposes" and "findings," we should use caution in relying on Congress's "admirable goal" of eliminating lead poisoning "to alter the apparent meaning of a specific provision." *United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 647 (2d Cir. 1993) (quoting *Nat'l Wildlife Fed'n*, 693 F.2d at 178). "It is not for us to rewrite the statute so that it covers . . . what we think is necessary to achieve what we think Congress really intended." *Lewis v. City of Chicago*, 560 U.S. 205, 215 (2010). Thus, without a congressional mandate in the TSCA, we have no authority to mandate that the EPA act to meet Congress's goals (even if we believe it is in the best interest of society for the EPA to act).[2]

---

[2] Petitioners requested that their petition be granted under either 15 U.S.C. § 2620 ("Citizens' petitions" under the TSCA) or 5 U.S.C. § 553(e) (right to petition for rulemaking under the APA). The EPA granted the request under the APA. Petitioners have not argued that their request should have been granted under the 15 U.S.C. § 2620.

**B.**

Because Petitioners failed to establish they are entitled to mandamus relief under the TSCA, they otherwise seek to establish jurisdiction under the APA. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–65 (2004). As the majority notes, the APA requires agencies to "proceed to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). Thus, Petitioners must show that (1) the EPA had a nondiscretionary duty to act under the APA and (2) the EPA unreasonably delayed in acting on that duty. *Norton*, 542 U.S. at 64; 5 U.S.C. §§ 555(b), 701(a)(2). If Petitioners establish a right to relief, we can only "compel agency action unlawfully withheld or unreasonably delayed." *See* 5 U.S.C. § 706(1).

It appears that everyone agrees that the EPA fulfilled its obligation to address Petitioners' petition under 5 U.S.C. § 553(e). However, the dispute arises with regard to whether the EPA assumed a nondiscretionary duty to engage in rulemaking when it "granted" the petition, and, whether, after granting the petition, the EPA unreasonably delayed in engaging in rulemaking. *See Am. Hosp. Ass'n*, 812 F.3d at 189–90. Although the EPA granted the petition, the EPA did not assume a duty to engage in rulemaking.[3] Because the APA creates a clear duty to act (if at all) only to those actions agreed upon by the EPA, we must examine its response.

In this case, Petitioners presented a petition to the EPA requesting that it begin rulemaking to (1) lower the dust-lead

---

[3] Petitioners do not argue on appeal that the EPA failed to act in accordance with its response in any manner except for Petitioners' assertion that the EPA agreed to engage in a rulemaking.

hazard standards, and (2) modify the definition of lead-based paint. The EPA responded to the petition. The parties agree that the EPA granted the request. However, the parties disagree what the grant provided. The language noted that the EPA would "begin an appropriate proceeding." The EPA also clarified that it was "not committing to a specific rulemaking outcome— including the specific level of the lead dust hazard standard—or to a certain date for promulgation of a final rule." With regard to the definition of lead-based paint, the EPA also noted that it would "initiate appropriate proceedings," but clarified that it would work with the Secretary of Housing and Urban Development ("HUD") to address the second part of the petition.[4]

After the response, the EPA did not delay in beginning "appropriate proceedings." To the contrary, the EPA engaged in research with regard to this issue, which ended just prior to this petition being filed. Hence, the EPA did not fail or delay in proceeding as it stated it would.

Nevertheless, the majority interprets the EPA's grant of the petition as an agreement by the EPA to engage in rulemaking (even though the EPA never stated that it was going to proceed in this manner). Reading the language of the order, it is not clear what the EPA meant by agreeing to "initiate appropriate proceedings"; the EPA's "granting" of the petition requesting rulemaking is arguably misleading,

---

[4] In January 2017, HUD issued new rules regarding dust-lead hazard action levels for floors and window sills. Although the EPA indicated that it would work with HUD on the issue of the lead paint definition, the new rules are not related to the lead paint definition. It appears that HUD did not change the lead paint definition in the new rules. Thus, the new rules do not clearly trigger a duty for the EPA to act.

because the language in the grant did not commit the EPA to ever engage in rulemaking. However, under the APA, we cannot place a greater duty upon the EPA than it agreed to do. *See Norton*, 542 U.S. at 64 ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."). Here, the EPA granted the petition with specific limitations, which did not necessarily include engaging in rulemaking. The EPA cannot be faulted by its response. As the D.C. Circuit noted, 5 U.S.C. § 553(e) "requires the agency to 'fully and promptly consider [the petition], [and] take such action as may be required . . . . The agency may either grant the petition, undertake public rule making proceedings or deny the petition.'" *WWHT, Inc. v. FCC*, 656 F.2d 807, 813 (D.C. Cir. 1981) (alteration omitted) (quoting S. Rep. No. 752 (1945)). "[T]he mere filing of a petition does not require an agency to grant it, or to hold a hearing, or engage in any other public rule making proceedings." *Id.* (quoting S. Rep. No. 752). The EPA has the discretion to grant or deny a petition, which would include, as here, granting the petition but limiting the scope of the request. If Petitioners were not satisfied with the limitations set forth in the EPA's response, they could have appealed the EPA's response at that time. Alternatively, Petitioners could have filed another petition requesting rulemaking in light of the information the EPA received in addressing this issue. Petitioners did neither.

Rather than reading the response and interpreting it, Petitioners and the majority criticize the EPA's response. They assert that not finding a duty (under the APA) for the EPA to engage in rulemaking creates a perverse incentive for the EPA to grant petitions and then not act in an effort to avoid judicial review. However, if the EPA does not act as it

suggests it will, then a petitioner can request judicial review.[5] Reading the EPA response, it is clear that the majority's characterization (of what happened here) lacks basis. Mandamus in this case is not appropriate, because the EPA did act. *See Gardner v. BLM*, 638 F.3d 1217, 1221–22 (9th Cir. 2011) (noting that "in the absence of a specific legislative or regulatory command," courts lack authority to require agency action). It responded to the petition; it engaged in proceedings related to lead paint and lead dust. Although the EPA did not engage in rulemaking as Petitioners requested, it was not required to do so. The EPA set forth its limitations and (thus far) has chosen not to engage in any further proceedings. We cannot and should not find a duty to act beyond what the agency stated it would do. Although we may not like the actions of the agency, our jurisdiction is limited to determine whether the agency assumed a duty, and, if so, the scope of that duty. Here, the EPA never assumed a duty to engage in a rulemaking; rather it only assumed a duty to "begin an appropriate proceeding," which it did.[6]

---

[5] Judicial review of an agency's decision made pursuant to § 553(e) is available, although the scope of review is "very narrow" and deferential; the agency's decision must be sustained "if it violates no law, is blessed with an articulated justification that makes a 'rational connection between the facts found and the choice made,' and follows upon a 'hard look' by the agency at the relevant issues." *WWHT, Inc.*, 656 F.2d at 809, 817 (quoting *Action for Children's Television v. FCC*, 564 F.2d 458, 479 (D.C. Cir. 1977)).

[6] Because I find that the EPA did not have a duty to act, I would not reach the issue of unreasonable delay.

## C.

Lastly, the majority turns to case law, *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150 (D.C. Cir. 1983) (per curiam), and *In re International Chemical Workers Union*, 958 F.2d 1144 (D.C. Cir. 1992) (per curiam), for support. The majority asserts these cases stand for the proposition that, if Congress grants an agency the authority to amend a standard, the agency is under "a duty to act where there is an 'obvious need, apparent to [the agency].'" Maj. Op. 12–13. One only has to read these cases to determine that the majority's reliance on them is misplaced. In *Public Citizen Health Research Group*, Congress instructed the Occupation Safety and Health Administration ("OSHA") to "give due regard to the urgency of the need for mandatory health standards for particular workplaces."**[7]** *Pub. Citizen Health Research Grp.*, 702 F.2d at 1153 (alterations omitted) (quoting 29 U.S.C. § 655(g)). The D.C. Circuit did not conclude that this language created a duty for OSHA to act. *See id.* Rather, it found no duty for OSHA to act based on that statutory language. Instead, the duty arose when OSHA *recognized* a need to act and *assumed* the duty when it stated it "inten[ded] to proceed with rulemaking." *Id.* at 1157; *see also Int'l Chem. Workers Union*, 958 F.2d at 1146 (noting that in response to a rulemaking petition, OSHA admitted a "need to embark promptly on further rulemaking"). Thus, both *Public Citizen Health Research Group* and *International Chemical Workers Union* were resolved under the APA's mandate "to conclude [within a reasonable time] a matter presented to it." *Pub. Citizen Health Research Grp.*, 702 F.2d at 1153–54 (alteration in original). Neither case can

---

**[7]** Even if this phrase could be read to have created a duty to act, similar language is absent from the TSCA at issue here.

be fairly read to suggest a statutory duty arises if the agency is aware of an "obvious need." *See Pub. Citizens Health Research Grp.*, 702 F.2d at 1154.

The EPA's refusal to act in light of the new information it obtained (even if frustrating) is within its authority set forth by Congress. Although the majority characterizes this result as a "conflict," no conflict actually exists here. The EPA had no duty to act under the TSCA, and the EPA concluded the duties it assumed in response to the rulemaking request. The fact that the EPA may now have knowledge that the current standards are insufficient to accomplish Congress's goals does not require it to act under either scheme the majority asserts here. Congress chose to leave it in the agency's discretion on when or whether to amend regulations. Although I recognize that we may believe the EPA should act under these circumstances,[8] "we are not free to rewrite the statute that Congress has enacted." *Dodd v. United States*, 545 U.S. 353, 359 (2005). The statutory language is clear and unambiguous, and, "[w]hen the statute's language is plain, the sole function of the courts—at least where the

---

[8] I am sympathetic to Plaintiffs' arguments that the EPA should enact rules to help eliminate lead poisoning in children. The EPA does not dispute that currently approved lead levels cause harm to children. It also does not specifically dispute that levels could be lowered to help eliminate this risk. Yet, the EPA refuses to engage in rulemaking to address this issue solely because Congress has not required it to act. Counsel for the EPA represented that the EPA was not interested in working with Plaintiffs on this issue. Further, the EPA represented that it had no plans to engage in rulemaking in the future on this very serious issue (despite representations in its brief that it would conclude these proceedings by 2023). Given these circumstances, I understand the majority's desire to find a duty for the EPA to act. I do not understand why the EPA has not acted. However, it is for Congress, not the courts, to mandate the EPA achieve the goals it set forth in its "findings" and "purposes."

disposition required by the text is not absurd—is to enforce it according to its terms." *Id.* (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000)).

Therefore, I respectfully dissent.